Frank A. CARTER, Jr., Chief Disciplinary Counsel

v.

Alfred E. BOLLENGIER.

No. 88–332–M.P.

Supreme Court of Rhode Island.

July 26, 1988.

Alfred E. Bollengier, pro se.

Frank A. Carter, Jr., Chief Disciplinary Counsel, pro se.

## OPINION

PER CURIAM.

This is a disciplinary proceeding in which we have directed the respondent, Alfred E. Bollengier, a member of the Rhode Island bar since October 1961, to appear before this court to show cause why he should not be disciplined. The show-cause order was issued following our receipt of a report from this court's disciplinary board recommending that Bollengier be disciplined for his having violated a variety of provisions of the Code of Professional Responsibility relating to the necessity of (a) depositing clients' funds in an identifiable account,[1] (b) promptly notifying the client of the receipt of client's funds,[2] and (c) the prompt remit-

1. DR 9–102(A).

2. DR 9–102(B)(1).

tance of those funds that the client is entitled to receive.[3] The board's report and recommendation was preceded by a hearing conducted by one of the board's hearing panels during the fall of 1987.

The episode that gives rise to the disciplinary proceedings began in January 1978 when a mother contacted Bollengier and asked him to represent her two sons who were the beneficiaries of the estates of their paternal grandmother and their father. Each brother had been offered $500 to execute a quitclaim deed releasing any and all interest they might have had to the real estate that constituted at least a portion of the estates. Bollengier agreed to act as the attorney and received a fee of $500 from the mother for looking into the inheritance situation. Both the mother and Bollengier agreed that his efforts were to be compensated on a "time" basis, but at no time, however, was there any agreement in regard to the hourly fee. It should also be pointed out that Bollengier made it perfectly clear that the brothers were adults at the time that he represented them. During the next four years Bollengier performed a variety of services for both the mother and her sons. The evidence about the amount of time he had expended in their behalf was accepted by the board.

In mid-December 1983 Bollengier received two checks totaling $7,612.99 from the administrator of the father's estate, representing money due the sons. The administrator testified before the panel that the checks were accompanied by a cover letter and releases for the brothers to sign. Bollengier acknowledged receiving the checks but insisted that they were not accompanied by either a cover letter or releases.

Sometime in late January 1984 Bollengier deposited the two checks received from the administrator in an account at the Washington Trust Company. He acknowledged that he did not forward this money to the brothers, nor did he notify them or their mother that he had received the proceeds from the father's estate.

The record indicates that Bollengier had maintained six separate accounts at the Washington Trust Company. One was designated a personal account; two were designated law office accounts; one was designated "boat" account; one only carried Bollengier's name; and another one was designated "client" account. The brothers' checks were deposited into account No. 24–839–5, which bore only Bollengier's name. A bank executive testified that this account could not be considered a client's account.

Bollengier acknowledged that this account was primarily a law office account, although on at least one occasion personal expenses were paid from it. He testified that the account consisted of certain fees that were received from clients and then deposited into the account. Expenditures from the account were for his secretary's salary; sometimes, as on one occasion, funds from that account were transferred to Bollengier's "boat" account and, on another occasion, funds were withdrawn to make a payment on a Florida condominium.

Account No. 24–839–5 had its ups and downs. At the time the administrator's checks were received, the account was in an overdraft status of approximately $900. When the checks were deposited, Bollengier immediately withdrew $2,000 and deposited that money into his "boat" account. The "boat" account, he explained, was used to pay the expenses of a commercial fishing boat he owned. The boat was available for hire. At the end of April 1984, account No. 24–839–5 had once again reverted to an overdraft status.

In late 1984 the brothers and their mother filed a complaint with the disciplinary board, alleging that they had received no accounting from Bollengier in regard to the estate's proceeds. He did not render a bill until early January 1985. He attempted to explain the delay by claiming that he had lost a portion of his time records and a realization on his part that his fee would exceed the total amount of the estate proceeds. Eventually he sent the brothers a statement showing a bill for services rendered in the amount of $7,073.91, from

**3.** DR 9–102(B)(4).

which he deducted the $500 retainer and a $300 fee awarded him by the Probate Court. This left a balance of $6,273.91. He deducted the $6,273.91 from the estate proceeds due the brothers of $7,612.99 and remitted to them a check in the amount of $1,486.38 which represented the net amount due the brothers plus interest of $147.30.

The brothers never cashed that check nor a second check sent to replace it. Sometime in 1987 Bollengier did forward a check in the amount of $3,850 to the brothers, which apparently satisfied their claim. However, at that point, his fate rested with the disciplinary board.

The board found that Bollengier has failed (1) to deposit the brothers' funds in an identifiable account, (2) to notify the brothers properly of the arrival of the administrator's checks, and (3) to remit those funds due his clients, the brothers, promptly. When it came to the credibility issue, Bollengier did not fare well. The board rejected his contention that the administrator had sent him only the checks and not the releases. The board expressed the belief that Bollengier's failure to notify the brothers was intentional on his part because of his desire that the brothers remain unaware of his receipt of their inheritance.

When Bollengier appeared before the hearing panel, he described himself as "ninety-eight percent" retired from the practice of law with his current emphasis on "tax work." When he appeared before this court he expressed similar sentiments and referred to his combat experiences during World War II for which he earned a variety of commendations, including three Silver Stars. The assistant disciplinary counsel, upon hearing Bollengier make similar remarks before the panel, gave an appropriate response that we believe merits repeating. Counsel responded to Bollengier's reference to his combat experiences by pointing out that when Bollengier joined the armed forces he took an oath to serve his country and that when he became an attorney he took an oath to "follow the dictates of our profession." In turning to the question of an appropriate sanction we are reminded that the primary purpose of attorney disciplinary proceedings is not punishment but protection of the public and the nurturing of public confidence in the bar by reaffirming the bar's fidelity to the high ethical standards that the public has a right to expect from members of the legal profession. *Carter v. Cianci*, 482 A.2d 1201 (R.I. 1984).

This court is of the belief that the imposition of a public censure will protect the public, the judicial system, and the legal profession, and will deter any future misconduct on Bollengier's part. Accordingly Alfred E. Bollengier is publicly censured for engaging in conduct that gave rise to this litigation.